## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| DANIEL SANTANA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| CITY OF BOSTON, GUSTAVO | )   No. 1:25-cv-10334-JEK |
| MEDINA, ERIC FRANCIS, JOHN | ) |
| CANTY, EDWARD GATELY, SERGIO | ) |
| MEDRANO, RYAN FULLAM, and | ) |
| CHRISTOPHER KEATON, | ) |
| | ) |
| Defendants. | ) |
|  |  |

## <u>MEMORANDUM AND ORDER ON DEFENDANTS' MOTIONS TO DISMISS</u>

**KOBICK, J.**

This civil rights action arises out of the August 2021 arrest of plaintiff Daniel Santana, who the police identified as a suspect in response to a report of an individual firing a gun into the air in downtown Boston. During the arrest, the responding officers broke the humerus bone in Santana's left arm. Santana was later charged with various firearms-related criminal offenses and detained. The charges were eventually *nolle prossed* by the Commonwealth. Santana now brings claims of false arrest, malicious prosecution, excessive force, and negligence against the City of Boston and seven of its police officers, Officers Gustavo Medina, Eric Francis, John Canty, Edward Gately, Sergio Medrano, Ryan Fullam, and Christopher Keaton. The City and the Officers have separately moved to dismiss those claims. For the reasons that follow, the Court will grant the motions as to Santana's false arrest and malicious prosecution claims, but deny the motions as to his excessive force claim and his claims of negligence against the City of Boston.

## BACKGROUND

The following facts, which are assumed true on a motion to dismiss, are drawn from the second amended complaint, documents fairly incorporated by reference in that pleading, and documents subject to judicial notice. *See Bazinet v. Beth Israel Lahey Health, Inc.*, 113 F.4th 9, 15 (1st Cir. 2024).[1] Those documents include Santana's arrest report, records of his criminal proceedings, and bodycam footage from the arresting officers. *See* ECF 14-1 through 14-6; ECF 24-2, ¶¶ 17, 35, 37 (second amended complaint referencing the arrest report and bodycam footage); *Esco v. City of Chicago*, 107 F.4th 673, 678 (7th Cir. 2024) (district courts "may examine exhibits, including video exhibits, . . . referenced in the pleading if they are central to the claim"); *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993) (on a motion to dismiss, a court can consider "documents the authenticity of which are not disputed by the parties," "official public records," "documents central to plaintiffs' claim," and "documents sufficiently referred to in the complaint").

On August 16, 2021, Officers Medina and Francis received a call from the police dispatcher that shots had been fired near Boston Medical Center. ECF 24-2, ¶ 15. According to a witness, the dispatcher reported, an unidentified male on Albany Street had fired shots into the air after an argument with another person. *Id.* ¶ 16; ECF 14-1, at 3. The witness had "observed a bright flash of light, which he believed to be a muzzle-flash, and heard a loud blast that he perceived to be a gunshot." ECF 14-1, at 3. The suspect was described as a Black Non-Hispanic male wearing a

---

[1] In opposing the motions to dismiss, Santana also moved for leave to file a second amended complaint. *See* ECF 24, at 5-6. Before and at the hearing, the defendants indicated that they do not oppose that motion and that the arguments made in support of their motions to dismiss the first amended complaint would apply equally to the second amended complaint. *See* ECF 26. Accordingly, with the parties' agreement, the plaintiffs' motion for leave to file a second amended complaint is granted. The Court regards the second amended complaint, *see* ECF 24-2, as the operative pleading, and the defendants' motions to dismiss as seeking dismissal of that pleading.

white T-shirt, blue jeans, white and blue Air Jordan sneakers, and a black fanny pack. ECF 24-2, ¶ 17; ECF 14-1, at 3.

Medina and Francis drove to Albany Street, where Medina identified Santana, a light-skinned Hispanic male who was wearing the same clothes described by the dispatcher and a black fanny pack. ECF 24-2, ¶¶ 18-19; ECF 14-1, at 3. Medina and Francis cornered Santana, exited their vehicle with their weapons drawn, and instructed Santana to put his hands up. ECF 24-2, ¶¶ 20-21. Santana attempted to comply, but, as he explained to the officers, he was able to lift only his right arm above his head because of an injury to his left shoulder that had required surgery two months prior. *Id.* ¶¶ 23-25. Medina and Francis ordered Santana to get on the ground. *Id.* ¶ 26. When Santana complied and laid on his back, the officers forcibly rolled him onto his stomach. *Id.* ¶¶ 26, 30. At some point during the interaction, Officers Canty, Gately, Medrano, Fullam, and Keaton arrived on the scene. *Id.* ¶ 31.

Throughout the interaction, Santana was unarmed and complied with the orders given to him. *Id.* ¶¶ 28-29. Despite his multiple pleas that, because of his left shoulder injury, he could not bend his left arm, the officers forcibly twisted that arm and knelt on him. *Id.* ¶¶ 27, 30, 32. Santana yelled, "[p]lease! I have a broken arm! I'm sorry! My arm is broken! Look! It's broken! My shoulder is broken! My left shoulder is broken, look! Please look! Please! My left shoulder please! Please look man! My left shoulder." *Id.* ¶ 33. Nevertheless, the officers continued to kneel on top of him and wrench his arm behind his back, causing the humerus bone in his left arm to loudly crack. *Id.* ¶¶ 34-35. Repeatedly, Santana screamed, "[y]ou're breaking my arm!" and one of the officers can be heard on bodycam footage saying, "the left arm is definitely fucking broken." *Id.* ¶¶ 36-37. Santana was then transported to Boston Medical Center, where he was diagnosed with a

mid-shaft fracture of his left humerus. *Id.* ¶ 38. As a result of the injury, Santana has limited use of his left arm and suffers from permanent nerve damage. *Id.* ¶ 39.

After his arrest, Santana was charged in Boston Municipal Court with, among other things, carrying a loaded firearm without a license and carrying ammunition without a firearm identification ("FID") card. *Id.* ¶ 40; ECF 14-2. According to the arrest report, after Officers Medina and Francis had identified Santana as the suspect and ordered him to stop, Santana, who was wearing the black fanny pack, continued walking away from them, ECF 14-1, at 3. They saw Santana attempt to conceal himself behind a black Mercedes-Benz. *Id.* When he emerged from behind the car, he was no longer carrying the fanny pack. *Id.* Officer Gately, who had an unobstructed view of Santana, saw him drop the fanny pack near the car and, as it struck the ground, heard a loud metallic thud that sounded to him like a firearm hitting the pavement. *Id.* Officer Gately recovered the fanny pack and, upon searching it, found a black handgun with an obliterated serial number loaded with 9mm rounds. *Id.* He also found a spent shell casing in the fanny pack. *Id.*

The charges against Santana were dismissed by the Boston Municipal Court after he was indicted by a grand jury in Suffolk Superior Court on charges of carrying a firearm without a license, in violation of M.G.L. c. 269, § 10(a); possessing ammunition without an FID card, in violation of M.G.L. c. 269, § 10(h)(1); and carrying a loaded firearm without a license, in violation of M.G.L. c. 269, § 10(n). *See* ECF 24-2, ¶ 41; ECF 14-3; *Commonwealth v. Santana*, No. 2101CR002426 (Boston Municipal Ct.) (docket entries dated April 5, 2022); *Commonwealth v. Santana*, No. 2284CR00100 (Mass. Super. Ct.), Dkt. No. 1. The Commonwealth later entered a *nolle prosequi* on all three charges after the Superior Court granted Santana's motion to suppress.

*Commonwealth v. Santana*, No. 2284CR00100 (Mass. Super. Ct.), Dkt. Nos. 15, 24. In the wake of his arrest, Santana was incarcerated for several months. ECF 24-2, ¶ 40.

On August 15, 2024, Santana initiated this lawsuit in Suffolk Superior Court. ECF 1-3, at 3. He filed an amended complaint on February 23, 2025. *Id.* at 5-17. That pleading asserted claims against the City of Boston and Officers Medina, Francis, Gately, Canty, Medrano, Fullam, and Keaton, in their individual capacities. ECF 24-2, ¶¶ 4-7. Against all defendants, Santana alleged claims of negligence (Count I) and, under 42 U.S.C. § 1983, claims of false arrest, malicious prosecution, and excessive force in violation of the Fourth Amendment (Counts III, IV, and V, respectively). *Id.* ¶¶ 55-60, 69-94. Against only the City of Boston, he also alleged negligent hiring, training, retention, or supervision (Count II). *Id.* ¶¶ 61-68.

The defendants removed the case to this Court in February 2025. ECF 1. Santana was granted leave to file a second amended complaint, which asserts the same claims against the same defendants. *See supra* note 1; ECF 24-2, ¶¶ 55-94. In two separate motions, the City of Boston and the individual police officer defendants moved to dismiss that pleading for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). ECF 10, 13. After the Court held a hearing on those motions, Santana consented to the dismissal of the excessive force claim against Officers Canty and Medrano without prejudice. ECF 33, at 1; ECF 31.

**STANDARD OF REVIEW**

In evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must determine "whether, construing the well-pleaded facts of the complaint in the light most favorable to the plaintif[f], the complaint states a claim for which relief can be granted." *Cortés-Ramos v. Martin-Morales*, 956 F.3d 36, 41 (1st Cir. 2020) (quotation marks omitted). The complaint must allege "a plausible entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

559 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679.

## DISCUSSION

### I.    Claims Against the Individual Defendants.

The Court first addresses the individual police officer defendants' motion to dismiss Counts III, IV, and V, which assert Fourth Amendment claims under 42 U.S.C. § 1983, and Count I, which asserts a negligence claim under Massachusetts common law.

#### A.    Malicious Prosecution Claim.

Count IV asserts that the individual defendants instituted criminal proceedings against Santana without probable cause, in violation of his right to be free from malicious prosecution under the Fourth Amendment. A Fourth Amendment claim for malicious prosecution protects individuals "targeted for unreasonable, baseless prosecutions, and who, as a result, are detained without probable cause during the pretrial period." *Hernandez-Cuevas v. Taylor*, 723 F.3d 91, 98 (1st Cir. 2013). To make out such a claim, a plaintiff must plausibly allege that "the defendant (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in plaintiff's favor." *Id.* at 101 (quotation marks omitted). The individual defendants contend that Santana's malicious prosecution claim falters at the second element, because the fact that he was indicted by a grand jury establishes that there existed probable cause to initiate criminal proceedings against him.

The Court agrees. "Generally, a grand jury indictment definitively establishes probable cause" to bring charges. *Gonzalez Rucci v. I.N.S.*, 405 F.3d 45, 49 (1st Cir. 2005); *accord Kennedy*

6

*v. Town of Billerica*, 617 F.3d 520, 534 (1st Cir. 2010). An exception to this rule exists, however, if the plaintiff plausibly alleges that "law enforcement defendants wrongfully obtained the indictment by knowingly presenting false testimony to the grand jury." *Gonzalez Rucci*, 405 F.3d at 49. Santana does not dispute that a grand jury indicted him on multiple charges arising out of the arrest at issue in this case, including charges of carrying a firearm without a license, possessing ammunition without an FID card, and carrying a loaded firearm without a license. *See* ECF 14-3. And Santana does not allege that the defendants wrongfully obtained that indictment through false or misleading testimony presented to the grand jury. Consequently, the grand jury's indictment forecloses Santana's claim that he was detained on charges that were not supported by probable cause, and his malicious prosecution claim against the individual officers must be dismissed. *See Kennedy*, 617 F.3d at 534 (affirming district court's dismissal of malicious prosecution claim "since a grand jury found there was probable cause to arrest" the plaintiffs, whose efforts to "impugn the grand jury testimony" were untimely); *Díaz-Nieves v. United States*, 858 F.3d 678, 688 (1st Cir. 2017) (same).

   B.    <u>False Arrest Claim.</u>

   Count III asserts a false arrest claim under the Fourth Amendment, which protects against "unreasonable . . . seizures" of the person. U.S. Const. amend. IV. To state a false arrest claim, Santana must plausibly allege that the arresting officers lacked probable cause to believe that he had committed or was committing a crime. *See Jordan v. Town of Waldoboro*, 943 F.3d 532, 545 (1st Cir. 2019), *abrogated on other grounds by Thompson v. Clark*, 596 U.S. 36 (2022). Probable cause for a warrantless arrest exists "when, at the time of the arrest, the 'facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing,

or is about to commit an offense.'" *Holder v. Town of Sandown*, 585 F.3d 500, 504 (1st Cir. 2009) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)). "To determine whether an officer had probable cause for an arrest, '[courts] examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause.'" *District of Columbia v. Wesby*, 583 U.S. 48, 56-57 (2018) (quoting *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)).

In seeking dismissal of Santana's false arrest claim, the individual officers make two arguments: (1) that the grand jury indictment establishes that the arrest was supported by probable cause, and (2) that, in any event, the undisputed facts and circumstances known to the arresting officers demonstrate that they had probable cause to arrest Santana. As to the first argument, the First Circuit has held that when a grand jury has found probable cause through its issuance of an indictment, that finding "dispos[es] of false arrest, malicious prosecution, and other derivative claims." *Kennedy*, 617 F.3d at 534. That holding appears to foreclose Santana's assertion that his arrest was not supported by probable cause and, as with his malicious prosecution claim, requires dismissal of the false arrest claim.[2]

But even if the grand jury's later indictment did not definitively establish that probable cause existed at the time of the arrest, Santana's false arrest claim must nevertheless be dismissed. Drawing all factual inferences in his favor, the allegations in the second amended complaint, together with the facts contained in the documents incorporated by reference, establish that the individual officers had probable cause to arrest Santana. Officers Medina and Francis learned,

---

[2] The analysis in *Kennedy* does not distinguish between probable cause to arrest and probable cause to initiate criminal proceedings. *See, e.g.*, *Kee v. City of New York*, 12 F.4th 150, 166 (2d Cir. 2021) (discussing the difference); *Sykes v. Anderson*, 625 F.3d 294, 310-11 (6th Cir. 2010) (same); *Jenkins v. Chief Just. of Dist. Ct. Dep't*, 416 Mass. 221, 245 (1993) (noting the difference between "probable cause to arrest [or search] and probable cause to bind over" (quotation marks omitted)).

through the police dispatcher, that a witness had observed a Black Non-Hispanic male, in a white T-shirt, blue jeans, and blue and white Air Jordans, and with a black fanny pack shoot a gun into the air after an argument. Medina and Francis found Santana—an individual who matched the description of the suspect precisely, with the exception of the description of his skin color—shortly thereafter in the vicinity of the shooting. Officer Gately watched Santana attempt to conceal himself behind a car and then drop the fanny pack, causing a metallic thud that, to Gately's ears, sounded like a firearm hitting the ground. Santana then emerged from behind the car without the fanny pack. These facts, known to the arresting officers,[3] would warrant a reasonably prudent officer in believing that Santana was the person who had reportedly committed a criminal offense by shooting a gun in the air near the Boston Medical Center, and then arresting him for, among other things, carrying a loaded firearm without a license. *See Holder*, 585 F.3d at 504; *Acosta v. Ames Dep't Stores, Inc.*, 386 F.3d 5, 10 (1st Cir. 2004) ("The uncorroborated testimony of a victim or other percipient witness, standing alone, ordinarily can support a finding of probable cause.").

Santana has two principal rejoinders. First, Santana contends that the witness reported seeing a Black Non-Hispanic male shoot the gun, but he is a light-skinned Hispanic male. This single discrepancy between the description of the suspect and Santana does not, given the other circumstances known to the arresting officers, defeat probable cause. *See Abreu-Guzman v. Ford*, 241 F.3d 69, 74 (1st Cir. 2001) (when "a physical description closely resembles an individual, some discrepancies in the description do not undermine the reasonableness of officers' belief that an arrestee was the person" identified); *Lallemand v. Univ. of Rhode Island*, 9 F.3d 214, 217 (1st

---

[3] The First Circuit has long recognized the rule that "law enforcement officials cooperating in an investigation are entitled to rely upon each other's knowledge of facts when forming the conclusion that a suspect has committed or is committing a crime." *United States v. Meade*, 110 F.3d 190, 193 (1st Cir. 1997).

Cir. 1993) (probable cause existed even though there were several discrepancies between the description of the suspect's appearance and his actual appearance). Santana's appearance—his white T-shirt, blue jeans, blue and white Air Jordan sneakers, and black fanny pack—otherwise matched the description of the suspect exactly. And Officer Gately heard him drop what sounded like a gun when Santana dropped the fanny pack in an apparent effort to conceal it.

Second, Santana contends that because the Superior Court granted his motion to suppress, the officers necessarily lacked probable cause to arrest him. But Santana has not supplied the Court with the Superior Court's decision on his motion to suppress and that decision is not accessible on the Superior Court's docket. Absent any basis for discerning the Superior Court's reasoning, the fact that Santana's motion to suppress was granted in Superior Court does not undercut the conclusion that Santana has not plausibly alleged facts in this Court that negate probable cause.[4] Accordingly, his Fourth Amendment false arrest claim must be dismissed.

C.    Excessive Force Claim.

Count V asserts that the individual defendants used excessive force during Santana's arrest, in violation of the Fourth Amendment, when they pointed a gun at him and twisted his left arm while kneeling on his back, resulting in a fractured left humerus. Santana has consented to dismissal of his excessive force claim without prejudice as to Officers Canty and Medrano, but not as to the remaining defendants, who raise several arguments. Officer Gately claims that because

---

[4] Santana does allege in the second amended complaint that the charges pending against him in the Boston Municipal Court were dismissed with prejudice "for lack of probable cause of the stop and arrest." ECF 24-2, ¶ 41. That allegation is directly contradicted by the docket of the Boston Municipal Court, which shows that the charges against Santana in that Court were dismissed because he had been indicted by a grand jury in the Superior Court. *See Commonwealth v. Santana*, No. 2101CR002426 (Boston Municipal Ct.) (docket entries dated April 5, 2022); *Henning v. Wachovia Mortg., FSB*, 969 F. Supp. 2d 135, 147 (D. Mass. 2013) ("When [public] documents contradict allegations in the complaint, the documents trump the allegations.").

he did not physically interact with Santana during the arrest, he cannot be held liable for the use of excessive force. Officers Medina, Francis, Gately, Fullam, and Keaton also argue that the force used was objectively reasonable and that they are entitled to qualified immunity.

For Section 1983 claims, "liability in damages can only be imposed upon officials who were involved personally in the deprivation of constitutional rights." *Pinto v. Nettleship*, 737 F.2d 130, 132 (1st Cir. 1984); *accord Cepero-Rivera v. Fagundo*, 414 F.3d 124, 129 (1st Cir. 2005). Gately contends that the excessive force claim against him must be dismissed because his bodycam footage shows that he was not personally involved in Santana's arrest. That footage captures Gately exiting his patrol car, drawing his firearm, pointing it at Santana, and ordering Santana to "get on the ground." ECF 14, Ex. E, at 00:15-00:40. At a minimum, it shows that Gately was not a mere spectator during Santana's arrest; he pointed a gun directly at Santana. The footage refutes Gately's argument that he cannot be liable because he was not personally involved in Santana's arrest, and it shows that Gately may have contributed to excessive use of force or failed to intervene to protect Santana from excessive use of force. *See Stamps v. Town of Framingham*, 813 F.3d 27, 39-41 (1st Cir. 2016) (pointing a gun at a prone, non-resistant individual who poses no threat can constitute excessive force in violation of the Fourth Amendment). The excessive force claim against Gately will not, accordingly, be dismissed for failure to plausibly allege personal involvement.

Officers Medina, Francis, Gately, Fullam, and Keaton next argue that they are entitled to qualified immunity on the excessive force claim. Qualified immunity protects public officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "The qualified immunity inquiry proceeds with a now-familiar two-part test: (1) whether the facts alleged or shown by the plaintiff make out a violation

of a constitutional right; and (2) if so, whether the right was clearly established at the time of the defendant's alleged violation." *Penate v. Hanchett*, 944 F.3d 358, 366 (1st Cir. 2019) (quotation marks omitted); *see Est. of Rahim by Rahim v. Doe*, 51 F.4th 402, 410 (1st Cir. 2022) ("The prongs need not be addressed in order, and an officer may be entitled to immunity based on either prong."). The Court will address each prong in turn.

The Fourth Amendment's guarantee of the right against unreasonable seizure includes a right against the use of excessive force "in the context o[f] arrest[s] and investigatory stop[s]." *Graham v. Connor*, 490 U.S. 386, 394 (1989). To prevail on a claim of excessive force, "a plaintiff must show that the defendant employed force that was unreasonable under all the circumstances." *Morelli v. Webster*, 552 F.3d 12, 23 (1st Cir. 2009). In determining whether an application of force is reasonable, a Court must consider "'the severity of the crime at issue, whether the suspect pose[d] an immediate threat to the safety of the officers or others, and whether [the suspect was] actively resisting arrest or attempting to evade arrest by flight.'" *Gray v. Cummings*, 917 F.3d 1, 8 (1st Cir. 2019) (quoting *Graham*, 490 U.S. at 396). The factors are analyzed objectively and considered from "the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396-97.

Applying these factors to the allegations in the second amended complaint, which at this stage are assumed true, Santana has plausibly alleged a violation of his right against the use of excessive force. While the crime reported by the police dispatcher—shooting a gun into the air near a hospital and in the middle of an urban neighborhood—was serious, Santana complied with Officer Francis and Medina's instructions when they cornered him, exited their vehicle with their weapons drawn, and instructed him to put his hands up. He complied with their order to lie on the ground, and he complied with all subsequent orders. After the officers forcibly rolled him on his

12

stomach, pinned him on the ground, and knelt on his back, he repeatedly warned them that he had a left shoulder injury that prevented him from moving his left arm. Santana did not resist at any point during the interaction, he was unarmed throughout the interaction, and he was not, when the officers approached him, actively committing any criminal offense. Nevertheless, the officers wrenched his left arm behind his back with such force that his left humerus fractured loudly, leaving no doubt in the officers' minds that they had broken his arm. These facts easily clear the bar for plausibly alleging objectively unreasonable use of force.

The individual defendants may still be entitled to qualified immunity if the law applicable to their use of force was not clearly established at the time of Santana's arrest. The "clearly established" prong involves two sub-inquiries. The first "'focuses on the clarity of the law at the time of the violation.'" *Penate*, 944 F.3d at 366 (quoting *Drumgold v. Callahan*, 707 F.3d 28, 42 (1st Cir. 2013)). The second "'focuses more concretely on the facts of the particular case and whether a reasonable defendant would have known that his conduct violated the plaintiff's constitutional rights.'" *Id.* (quoting *Drumgold*, 707 F.3d at 42). "The salient question is whether the state of the law at the time of the alleged violation gave the defendant fair warning that his particular conduct was unconstitutional." *Maldonado v. Fontanes*, 568 F.3d 263, 269 (1st Cir. 2009).

The law at the time of Santana's arrest clearly established that kneeling on a non-resisting, prone arrestee's back and wrenching his arm with such force as to break his arm is unconstitutional. The First Circuit explained in 2009 that its case law "supplies a crystal clear articulation of the right, grounded in the Fourth Amendment, to be free from the use of excessive force by an arresting officer." *Morelli*, 552 F.3d at 23. And on Santana's well-pled version of the facts, an objectively reasonable officer would have known that his conduct violated Santana's Fourth Amendment

rights. The officers may have reasonably believed that Santana was armed when they first encountered him, as they were responding to a report of a shooting. But they did not break his arm until after they had surrounded him, ordered him to get down on the ground, secured him, watched him comply with their orders, noticed that he made no effort to resist arrest, and heard him say repeatedly that he could not use his left arm due to a prior injury. The facts of this case are sufficiently analogous to prior First Circuit precedent to put a reasonable police officer on notice that, under those circumstances, wrenching Santana's injured arm with force enough to fracture it was unconstitutional. *See, e.g.*, *Heredia v. Roscoe*, 125 F.4th 34, 47-48 (1st Cir. 2025) (citing cases and explaining that its precedent has been clear since 2010 that "it is unconstitutional for an officer to use a takedown maneuver to take an arrestee to the ground, hitting the arrestee's head on the pavement, after the arrestee had already shown his hands and submitted to arrest"); *Raiche v. Pietroski*, 623 F.3d 30, 39 (1st Cir. 2010) (holding that a "reasonable officer with training . . . would not have needed prior case law on point to recognize that it is unconstitutional to tackle a person who has already stopped in response to the officer's command to stop and who presents no indications of dangerousness"); *Jennings v. Jones*, 499 F.3d 2, 19 (1st Cir. 2007) ("[A]n objectively reasonable officer . . . would not have believed that it was lawful to *increase* the amount of force that he used after [plaintiff] ceased resisting and stated that [defendant] was hurting him."). Officers Medina, Francis, Gately, Fullam, and Keaton are not, accordingly, entitled to dismissal of Santana's excessive force claim on the basis of qualified immunity.

D.    <u>Negligence Claim.</u>

Count I asserts a negligence claim, premised on the contention that the individual defendants violated a duty of care "in the application of force when detaining [Santana] and taking him in to custody." ECF 24-2, ¶ 56. These defendants argue that the claim is barred by the

Massachusetts Tort Claims Act ("MTCA"), which provides that the exclusive remedy for injuries "caused by the negligent or wrongful act or omission of any public employee while acting within the scope of his office or employment" shall be an action against the public employer. M.G.L. c. 258, § 2. Public employers include "the commonwealth and any county, city, town, educational collaborative, or district," as well as "any department, office, commission, committee, council, board, division, bureau, institution, agency or authority thereof." *Id.* § 1. The MTCA thus "shields public employees from personal liability for negligent conduct" performed in the scope of their employment. *Caisse v. DuBois*, 346 F.3d 213, 218 (1st Cir. 2003) (citing *McNamara v. Honeyman*, 406 Mass. 43, 46 (1989)). Here, the individual defendants were employees of the Boston Police Department acting within the scope of their responsibilities when they interacted with Santana. Accordingly, Santana's negligence claim may be asserted only against their employer; as to the individual defendants, it must be dismissed as barred by the MTCA.

## II.    Claims Against the City of Boston.

The Court next addresses Santana's claims against the City of Boston.

### A.    Municipal Liability Under Section 1983.

Counts III through V assert Fourth Amendment claims against the City under 42 U.S.C. § 1983. "[A] municipality can be found liable under § 1983 only where the municipality *itself* causes the constitutional violation at issue" because "*[r]espondeat superior* or vicarious liability will not attach under § 1983." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (citing *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694-95 (1978)). A plaintiff must allege that the municipality, "through its deliberate conduct, . . . was the 'moving force' behind the injury alleged," *Bd. of Cnty. Comm'rs of Bryan Cnty., Oklahoma v. Brown*, 520 U.S. 397, 404 (1997), and that the illegal action was taken "pursuant to official municipal policy" or custom "of some

nature," *Monell*, 436 U.S. at 691. "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). It may also encompass a municipality's failure to train its employees, if the plaintiff can demonstrate that "municipal decisionmakers either knew or should have known that training was inadequate but nonetheless exhibited deliberate indifference to the unconstitutional effect of those inadequacies." *Wadsworth v. Nguyen*, 129 F.4th 38, 68 (1st Cir. 2025) (quotation marks omitted). "Deliberate indifference requires a showing that [the City] disregarded a known or obvious risk of serious harm following from its failure to develop an adequate training program." *Id.*

Santana claims that his injuries from the false arrest, malicious prosecution, and excessive force occurred because of the individual officers' execution of the City of Boston's policies or customs, which were the moving force behind the constitutional violations he has asserted. Because Santana has failed to allege plausible claims for false arrest or malicious prosecution against the individual defendants, those claims against the City of Boston must also be dismissed for lack of an underlying constitutional violation. *See Doe v. City of Boston*, 145 F.4th 142, 156 (1st Cir. 2025) ("[T]o find that a city is subject to *Monell* liability, a court must first find that a city employee committed an underlying constitutional violation."). As to the excessive force claim, Santana alleges he was subjected to excessive force during his arrest because (1) the Boston Police Department maintained a custom under which officers understood that they should not report other officers' excessive force during arrests, ECF 24-2, ¶¶ 43-50; and (2) the Boston Police Department failed to investigate and discipline officers for using excessive force, *id.* ¶¶ 42, 49-50.

Both of these theories support a plausible *Monell* claim against the City. As to the first, Santana alleges that the City tolerated excessive force during arrests by upholding a "code of

silence" or a "blue wall" under which officers knew they should not report misconduct by fellow officers. *Id.* ¶ 43. "[U]nlike a 'policy,' which comes into existence because of the top-down affirmative decision of a policymaker, a custom develops from the bottom-up." *Baron v. Suffolk Cnty. Sheriff's Dept.*, 402 F.3d 225, 236 (1st Cir. 2005), *abrogated on other grounds by Jennings v. Jones*, 587 F.3d 430, 438 n.10 (1st Cir. 2009). A custom may be attributable to the municipality when it is "so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice." *Id.* at 236-37. Santana's allegations fit this pattern. He alleges that the Boston Police Department had a custom of "making it difficult for citizens to file complaints about the conduct of Boston police officers," for complaints to be properly investigated, and for officers to be properly disciplined for misconduct. ECF 24-2, ¶¶ 48-49. The custom allegedly prevented the Department from "properly investigat[ing] claims and failing to discipline officers who used unreasonable force." *Id.* ¶¶ 43, 46, 48-49. Santana bolsters his assertions by alleging a series of events in the 1990s when officers were knowingly shielded from investigations for misconduct, including the use of excessive force. *Id.* ¶¶ 44-45. And he quotes the former Mayor of Boston's acknowledgement that "officers were intimidated into silence for fear of retaliation" in internal investigations. *Id.* ¶ 46. Viewed in the light most favorable to Santana, these allegations could plausibly establish that the City's custom of a "code of silence" or "blue wall" caused the excessive force violation that Santana has asserted.

Santana's second theory alleges that the Boston Police Department failed to train, investigate, and discipline officers for using excessive force. In a failure to train claim, a plaintiff must show that "municipal decisionmakers either knew or should have known that training was inadequate but nonetheless exhibited deliberate indifference to the unconstitutional effects of those

inadequacies." *Haley v. City of Boston*, 657 F.3d 39, 52 (1st Cir. 2011). "A pattern of similar constitutional violations" is "'ordinarily necessary' to demonstrate deliberate indifference." *Connick*, 563 U.S. at 62. The same standard applies where the claim is a failure to supervise or discipline. *See Rodriques v. Furtado*, 950 F.2d 805, 813 (1st Cir. 1991) (citing *Bordanaro v. McLeod*, 871 F.2d 1151, 1158 (1st Cir. 1989)). The First Circuit's decision in *Haley v. City of Boston* is instructive. The plaintiff there alleged that the unconstitutional suppression of evidence, "if not the result of a standing policy, was precipitated by poor training, to which the City was deliberately indifferent." *Haley*, 657 F.3d at 52. The First Circuit held that the plaintiff sufficiently stated a claim that the City "turned a blind eye to the need for training" in part because the Boston Police Department's "failure to disclose [witness] statements is wholly unexplained" and "[d]isclosure abuses are a recurring problem in criminal cases." *Id.* at 52-53. Likewise, Santana alleges that the Department "failed to provide adequate training as to the appropriate ways in which to take an individual into custody," ECF 24-2, ¶ 65; "fail[ed] to properly investigate complaints of misconduct" regarding excessive force, *id.* ¶¶ 42-47; and failed "to discipline officers who used unreasonable or excessive force," *id.* ¶ 42. While a "different kind of proof" is required for each *Monell* claim, Santana can draw on "many of th[e] same facts" from his unconstitutional custom claim, which support the inference that the City's failure to investigate or discipline officers for use of excessive force amounted to deliberate indifference. *Haley*, 657 F.3d at 51-52. Taken together, Santana's allegations permit the inference that the Boston Police Department failed to adequately train, investigate, and discipline officers regarding excessive force during arrests, and that these failures were the moving force behind the excessive force he allegedly experienced.

Santana has, accordingly, sufficiently stated a Section 1983 claim against the City based on its alleged custom of perpetuating a "code of silence" and its purported failure to train,

investigate, and discipline officers for their unwarranted use of force. The City's motion to dismiss Count V will be denied.

B.    <u>Negligence Claims Under the MTCA.</u>

Counts I and II assert claims of negligence and negligent hiring, training, retention, or supervision, respectively, against the City of Boston. The City contends that both claims are barred because Santana failed to timely present them to the City in compliance with the MTCA, and that Count II is insufficiently pleaded.

Under the MTCA, a plaintiff may not institute a civil action against a public employer unless (1) he has "presented his claim in writing to the executive officer of such public employer within two years after the date upon which the cause of action arose," and (2) the executive officer has denied the claim in writing or failed to issue a denial within six months. M.G.L. c. 258, § 4. "Th[e] strict presentment requirement is a statutory prerequisite for recovery under the [MTCA]." *Shapiro v. City of Worcester*, 464 Mass. 261, 267 (2013). Santana alleges that, before instituting this action, he served the City of Boston with a notice of claim on August 15, 2023, within the two-year limitations period provided by the MTCA. ECF 24-2, ¶ 12. The City disputes this allegation, claiming that the City has no record of receiving such a letter in August 2023. ECF 11, at 7. In response, Santana attached the presentment letter, dated August 15, 2023, ECF 24-1, at 1-4, and submitted an affidavit certifying the delivery of the presentment letter within the deadline, ECF 32, at 1-2. But the Court need not look to these latter documents, because an affirmative defense, such as the argument that a claim is barred by defective presentment, may prevail on a motion to dismiss only if "'the facts establishing the defense are clear on the face of the plaintiff's pleadings.'" *Trans-Spec Truck Serv., Inc. v. Caterpillar Inc.*, 524 F.3d 315, 320 (1st Cir. 2008) (brackets omitted) (quoting *Blackstone Realty LLC v. F.D.I.C.*, 244 F.3d 193, 197 (1st Cir. 2001));

*see Theisz v. Mass. Bay Transp. Auth.*, 481 Mass. 1012, 1014 (2018) (inadequate presentment is an affirmative defense). Where the Court must accept as true Santana's allegation that he *did* timely present his claims to the City, it cannot accept at this stage in the proceedings the City's claim of defective presentment or its argument that the MTCA requirements have not been met.

The City also argues that Santana failed to plead sufficient facts to support allegations that it was negligent in hiring, training, retaining, and supervising the individual defendants. Supervisory negligence can lie against municipalities "where the municipality knew or should have known about an underlying, identifiable tort which was committed by named or unnamed public employees." *Kennedy*, 617 F.3d at 533. To establish supervisory negligence under Massachusetts law, "a plaintiff must show that the 'employer [became] aware or should have become aware of problems with an employee that indicated his unfitness, and the employer fails to take further action such as investigating, discharge or reassignment.'" *Helfman v. Northeastern Univ.*, 485 Mass. 308, 326 (2020). This notice requirement is applied to claims that employers negligently trained, supervised, retained, and hired employees. *Id.*; *see Doe v. Stonehill Coll., Inc.*, 55 F.4th 302, 338 (1st Cir. 2022).

In light of the conclusion that the *Monell* claim alleged in Count V can proceed on a theory of failure to train, investigate, or discipline, the Court finds that the same reasoning applies to Santana's negligent supervision, training, and hiring theory under state law. *Weiss v. Lavallee*, No. 01-cv-40177-FDS, 2005 WL 8176485, at *22 (D. Mass. Oct. 7, 2005) ("[T]he negligence required for recovery under the MTCA for alleged inadequate police training is similar, if not identical, to the deliberate indifference required under § 1983 in municipal liability claims." (citing *Parker v. Town of Swansea*, 270 F. Supp. 2d 92, 101-02 (D. Mass. 2003))). Santana's negligent retention theory similarly survives because this theory "fall[s] under the umbrella of negligent supervision."

*Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 613 (D. Mass. 2016) ("'Negligent supervision' is probably a more accurate label for the tort of negligent retention, because in some situations the appropriate course of action for an employer is to dismiss an employee and in other situations it may be more appropriate to reassign that employee or take some other course of action." (quoting *Great No. Ins. Co. v. Paino Assocs.*, 364 F. Supp. 2d 7, 20 (D. Mass. 2005))). And Santana has specifically alleged that two of the defendants—Officers Gately and Medina—have had previous complaints filed against them for use of force. ECF 24-2, ¶¶ 52-53. Accepting Santana's allegations as true and viewing them in the light most favorable to him, Santana plausibly alleges that the City was negligent in its hiring, retention, training, or supervision of the individual defendants. Accordingly, the City's motion to dismiss Counts I and II will be denied.

## CONCLUSIONS AND ORDERS

For the foregoing reasons, the defendants' motions to dismiss, ECF 10, 13, are GRANTED in part and DENIED in part. With respect to the City of Boston, Counts III and IV are DISMISSED with prejudice, and Counts I, II, and V remain. With respect to Officers Medina, Francis, Gately, Fullam, and Keaton, Counts I, III, and IV are DISMISSED with prejudice, and Count V remains. And with respect to Officers Canty and Medrano, Counts I, III, and IV are DISMISSED with prejudice, and Count V is DISMISSED without prejudice.

SO ORDERED.

/s/ Julia E. Kobick
JULIA E. KOBICK
Dated: February 2, 2026            UNITED STATES DISTRICT JUDGE